# STATEMENT OF FACTS

## SEXUAL ASSAULT OFFENSES

The below describes three sexual assault offenses committed by the same individual over a span of almost 14 years. Offense One is a stranger case that occurred on or about August 24, 2009, in Washington, D.C. in which the perpetrator blindfolded, bound and raped the victim while armed with a knife. Offense Two is a domestic violence rape that occurred on December 14, 2009, in Washington, D.C., in which the perpetrator strangled, raped and threatened to kill the victim. The defendant plead guilty for this conduct in 2010. Offense Three is an acquaintance case that occurred on or about April 17, 2023, in Washington, D.C., in which the perpetrator bound, threatened to stab, torture and kill the victim, and raped the victim while armed with a knife. All three offenses are connected by DNA belonging to the same perpetrator, John Raymond Conner III. In Offense Two, the victim also identified that same perpetrator by name, and in Offense Three, the victim identified the same perpetrator by first name, social media profile and confirmation photograph as her rapist.

## Offense One: (MPDC Agency Case #: 09-121037):

This case occurred on or about August 24, 2009 at approximately 9:00 p.m. inside of 2600 Douglass Road, SE, Washington, D.C. (an elementary school). The victim in this case reported that she was sexually assaulted at knifepoint by an unknown suspect. An MPDC detective responded to the scene to investigate. Below is the quoted narrative from the original responding detective's initial case resume:

> "NARRATIVE:
> On Monday August 24, 2009 at approximately 2120 hours member of the Metropolitan Police Department Seventh District received a radio run for a criminal assault at 2600 Douglas Rd. S.E. Officer Martin and Banks responded to the location and locate the complainant. The complainant is Spanish speaking and the officer requested the assistance of a Spanish speaking officer. Officer Alvarenga, J. responded and spoke to the complainant. The complainant inform Officer Alvarenga that she was cleaning the classroom and an unknown male came in the classroom put a knife to her neck forced her into the bathroom and made her to perform oral and vaginal intercourse. Ofc. Banks telephoned the Sexual Assault Office and reported the above information and Detective Zibrat advised the officer that we would be responding to there location.
>
> "INVESTIGATION:
>
> On Monday August 24, 2009 at approximately 2210 hours the undersigned detective along with Detective Zibrat responded 2600 Douglass Rd. S.E. and spoke to the Officers on the scene. Officer Banks stated that the complainant was in the back of the medic unit, medic unit ambulance 18. The ambulance crew stated that the complainant sustained minor injuries and did not need to be transported by

ambulance. The complainant sustained a cut to her left arm and the back of her neck.

Officer Alvarenga stated what was mentioned in the above complaint and that the complainant was blindfolded and had her hands tied behind her back.

The undersigned detective along with detective Zibrat interviewed the complainant with the assistance of Officer Alvarenga. The complainant stated that she was in the classroom bend over putting the chairs down. Someone came behind her and put a knife to the back of her neck and pushed her in the bathroom, which is in far corner of the classroom. The complainant stated once in the bathroom, the suspect tied her hands behind and put a blindfold over her eyes. The complainant stated that she was screaming and the suspect said something that she did not understand and turned off the lights.

The complainant stated that the suspect pushed her down and put his penis in her mouth. The complainant stated that suspect did not ejaculate in her mouth. The complainant stated that suspect took his penis out of her mouth and turned her around, pulled her pants and underwear down to her knees and bent her over and put his penis in her vagina. The complainant stated that the suspect did not ejaculate, he just stopped and left out of the bathroom and left her in there.

The complainant stated that she was able to get to her cell phone and call her husband, who was in the building. Husband found her took off the blindfold and untied her.

The complainant stated that she was unable to get any description of this person.

The complainant stated that the suspect was saying a lot things, but she only recognized "Bitch and Shut-up" when he put the knife to her neck and was making her suck his penis.

The complainant was taken to Washington Hospital Center for SANE Examination, results pending.

The complainant and her husband are part of the cleaning crew for the school. The complainant's husband, who shall be known as W-1 was on the scene. The undersigned detective also interviewed him. W-1 stated that he had just left his wife to dump the trash. W-1 stated that was gone approximately fifteen minutes, when he received a phone call from wife. W-1 stated that C-1 called stating "help me, don't leave". W-1 asked her if she was in the classroom and went where he left and found her tied up and blindfolded. W-1 stated that he removed the blindfold and took off the white elastic and shoestrings the suspect used. W-1 stated that he took to the storage area and cleaned her off and gave her another shirt to put on. W-1 stated that he called his manager and told him what. W-1 stated that he did not see anyone or hear anything."

The victim described her attacker as an unknown male and also reported suffering a cut to the back of her neck and to her left arm as a result of the rape.

Crime scene officers processed the scene and recovered, among other items, one shoestring and one plastic bag containing a piece of white cloth and a white plastic band. In addition, they recovered a plastic bag containing one blue smock with the following items recovered from the pockets of the smock: one spare single edged blade, one scraper, Jolly Rancher candies and folded plastic bags.

Also in the case file, there is an Incident Based Event Report dated August 31, 2009, reflecting the victim's report that a laptop was stolen from the location, 2600 Douglas Place SE. The event start and end time is August 24, 2009 from 2100 to 2114 hours.

During the SANE exam of the victim at the hospital on August 25, 2009, the SANE nurse collected intimate swabs from the victim's body to include oral swabs and smears and vaginal swabs and smears. The SANE report documented that the victim was married and had engaged in consensual coitus in the prior 72 hours.

The rape kit swabs were later tested for DNA. On March 19, 2010, the Metropolitan Police Department issued a Serology Report which concluded that semen was identified on the vaginal samples. This report also concluded that semen was not identified on the oral swabs. Due to semen being identified on the vaginal samples, the samples were sent to Bode Technology for DNA testing.

On November 3, 2010, Bode Technology issued a Forensic Case Report which contained the following conclusions regarding vaginal swabs, MPD Item 11, Bode Item numbers WDC1001-0006-E01 and WDC1001-0006-E02:

1. A DNA profile was obtained from sample WDC1001-0006-R03 [the victim's known].
2. The DNA profile obtained from the sperm fraction (SF) of sample WDC1001-0006-E01 is consistent with a mixture of at least two individuals including at least one male contributor.
3. The DNA profile obtained from the epithelial fraction (EF) of sample WDC1001-0006-E01 is consistent with the victim. One additional allele was obtained at the VWA locus.
4. The DNA profile obtained from the sperm fraction (SF) of sample WDC1001-0006-E02 is consistent with a mixture of at least two individuals including at least one male contributor.
5. The DNA profile obtained from the epithelial fraction (EF) of sample WDC1001-0006-E02 is consistent with the victim. One additional allele was obtained at the D3S1358 locus.

On January 24, 2023, at approximately 1200 hours, this affiant and Det. Devlin met with the victim and W-1. During the conversation, the victim relayed that she believes that the perpetrator could

have been the school maintenance/engineer who was on the scene that night when the assault occurred. She stated that she remembered a distinct odor of the perpetrator and then remembered having brief encounters in passing with this maintenance person subsequent to the assault. During these encounters with the maintenance person, she smelled the same odor as the perpetrator. She also thought it made sense because it seemed plausible that the person who assaulted her may have had access to locked areas of the school. Both the victim and her husband stated that this maintenance person worked at the school in that capacity before and after the assault. They also mentioned that they told their supervisor about the assault and that they thought that their supervisor may have mentioned this to the maintenance man. They then added that it was their memory that the maintenance man may have gotten injured on the job shortly after the assault and then subsequently left the job thereafter. Once this affiant later received the CODIS match to Conner in this case, this maintenance man was eliminated as a person of interest.

Also during this meeting, both the victim and W-1 consented to giving buccal swabs to assist with further DNA testing in this case. As a result, this affiant retrieved known buccal swabs from the victim and W-1 and subsequently turned those swabs over to a Central Evidence Technician at the DC Department of Forensic Sciences on the same date.

The DNA extracts from the DNA testing conducted by Bode Technology in 2010, along with the new reference samples of the victim and W-1, were sent back to Bode Technology for re-testing in 2023.

As a result, on September 14, 2023, Bode Technology issued a Supplemental DNA Case Report which contained the following conclusions:

> **"MALE DNA SCREENING CONCLUSIONS:**
>
> The evidence was screened to identify samples containing sufficient male DNA expected to produce data suitable for comparisons.
>
> 1. Male DNA was indicated in the following sample with the presence of high levels of total human DNA compared to male DNA. This sample was processed further.
>
>    WDC1001-0006-E-05 [extract from vaginal swab WDC1001-0006-E01-EF]
>
> 2. Male DNA was indicated in the following sample. This sample was processed further.
>
>    WDC1001-0006-E-06 [extract from vaginal swab WDC1001-0006-E01-SF]
>
> **STR PROCESSING, RESULTS, AND CONCLUSIONS:**
>
> The evidence was processed for DNA typing using GlobalFiler kit.
>
> 1. DNA profiles were obtained from samples WDC1001-0006-R-04 [W-1] and WDC1001-0006-R-07 [the victim].

2. The DNA profile obtained from sample WDC1001-0006-E-05 is consistent with a mixture of two individuals including [the victim] and one male contributor. This mixture profile was interpreted assuming two contributors.

   [The victim] is expected to be present in the mixture obtained from sample WDC1001-0006-E-05 and was subtracted from the mixture for interpretation purposes.

   [W-1] is excluded as a possible contributor to the mixture profile obtained from the sample listed above.

3. The DNA profile obtained from sample WDC1001-0006-E-06 is consistent with a mixture of three individuals including [the victim] and at least one male contributor. This mixture was interpreted assuming three contributors.

   [The victim] is expected to be present in the mixture obtained from sample WDC1001-0006-E-06 and was subtracted from the mixture for interpretation purposes.

   [W-1] is assumed to be present in the mixture obtained from sample WDC1001-00006-E-06 and was subtracted from the mixture for interpretation purposes."

The unknown male profile obtained from the sperm fraction of the vaginal swabs as contained in the Bode Technology Supplemental DNA Case Report issued on September 14, 2023 was uploaded into CODIS.

As a result, on January 26, 2024, the State of Wyoming Division of Criminal Investigation issued a CODIS report reflecting the following:

> "The DNA profile obtained from the sperm fraction from the vaginal swabs (Item 11) in the above listed case [09-121037] was searched in the Wyoming State DNA Database and submitted to the National DNA Index System. The search of this specimen resulted in matches with specimens from the following cases:
>
> 1. Metropolitan Police Department, CCN 09-121037 (1st Degree Sexual Abuse w a knife) [Offense One];
> 2. Prince George's County Police Department, Report Number: 09-192-1611 (First Degree Rape) [Not described herein]
> 3. Metropolitan Police Department, CCN: 09-178350 (1st Degree Child Sexual Abuse) [Offense Two]
>
> At least one of the matching specimens has been associated with suspect John Raymond Conner (Conner)."

On February 1, 2024, this affiant conducted a brief follow-up interview with the victim in this case. During the interview, the victim stated she did not know anyone by the name of John Raymond Conner.

The victim also stated that as a result of the sexual assault, she applied for a U Visa and completed the process.

It should be noted that in the original detective's casefile, there is a report that appears to be a list of names of sex offenders who resided in PSA 703, which is the police service area in which this offense occurred.

**Offense Two: (MPDC Agency Case #: 09-178350):**

Conner was arrested on December 15, 2009, in connection with a December 14, 2009, sexual assault of his girlfriend. Conner pled guilty on October 1, 2010, in that matter, pursuant to Alford v. North Carolina, 400 U.S. 25 (1970), to Third Degree Sexual Abuse and Kidnapping. As a result of this conviction, his known DNA profile was later uploaded into the CODIS National DNA Database as a convicted offender. Conner was also required to register as a sex offender.

**Offense Three: (MPDC Agency Case #: 23-059757):**

This case occurred on or about April 17, 2023, from approximately 0036 hours to approximately 0900 hours inside of an apartment in the 300 block of K Street, NW, Washington, D.C. The victim reported that she was sexually assaulted at knifepoint by a known acquaintance, later identified as Conner. An MPDC detective responded to the scene to investigate. Below is the quoted narrative from the original responding detective's initial case resume:

> "The complainant reported that the suspect had messaged her using Facebook Messenger for a haircut. The complainant has known the suspect for about a year and states that she has cut his hair before and he has stayed the night at her apartment on the couch, with no issues. The complainant stated that she is not interested in men sexually and that she likes women. The complainant stated that she agreed to do the suspect's hair and they met up at Gallery place after the complainant finished work on 04/16/2023 and they walked to the complainant's apartment.
>
> They hung out at the complainant's apartment and the complainant cut the suspect's hair. It was late in the evening and the complainant went to bed, locking her bedroom door, leaving the suspect to sleep in the living room. Sometime after the complainant went to bed there was a knock on her bedroom door. The complainant stated that she sleeps naked because she is in her bed, at home comfortable. The complainant stated she was not really awake when she opened her bedroom door a little to see what the suspect wanted. The suspect asked the complainant for "sheets", rolling papers and the complainant informed the suspect that they were in the living room and went to shut her bedroom door.

The suspect then brandished a kitchen knife at the complainant pushed his way through the bedroom door and held a knife at the complainants throat, telling the complainant to shut up and do what he tells her to. The suspect started to grab pieces of the complainant's clothing to tie the complainant's hands together and her feet together. The suspect grabbed the complainant's robe string and managed to tie her hands together. The suspect then put possible panties in the complainant's mouth and tied something to her head to stop the complainant from moving her head.

The suspect told the complainant to get on the floor and he tried to perform cunnilingus on the complainant. The suspect told the complainant that because she was a lesbian he was going to show her how not to be a dyke. The complainant then demanded oral sex from the complainant and forcefully pushed his penis into the complainant's mouth. The complainant tried telling the suspect that she was in pain but the suspect did not care. From around 0200 to 0700 to 0800 hours the suspect continually forced his penis deep into the complainant's mouth and throat forcing the complainant to gag and struggle for air. The complainant stated the suspect forcing his penis into her mouth and down her throat not only made her gag but literally throw up.

Eventually the complainant was told to get on the bed with the suspect. Once on the bed, the suspect did penetrated the complainant vaginally, but spent more of that time penetrating the complainant anally with his penis. The complainant stated she started to cry and the suspect told her to shut up and punched the complainant in her right temple and further back on her head. The complainant stated that when she was not doing as the suspect demanded he would choked her with one hand and cover her nose or choke her with both hands one about the other leaving her nose free.

The complainant stated she kept begging the suspect to stop and he was not listening. The complainant stated the suspect put the knife against her throat multiple times and would threaten to stab the complainant. The complainant stated she was quiet for most of the time because when she did speak she would make the suspect act worse toward her. When the suspect was penetrating the complainant anally she told him it was painful and the suspect threatened to put the knife in her anus if she did not let him penetrate her with his penis.

The suspect became tired and lay on top of and behind the complainant while her hands and feet were still tired. The suspect threatened to torture the complainant if she did not shut up. The complainant stated hours were going by and the suspect told the complainant that they were going to do this all day and all night into the next day. The complainant told the suspect that she had to go to work and the suspect told the complainant that she was not going anywhere and that this is what happens, when she does not just give him what he wants.

The complainant stated around 0800 hours or so in the morning the complainant stated she lied to the suspect about an inspection of her apartment and how they had

> keys and would let themselves in. The complainant stated she was doing everything she could to calm the suspect and get him to leave her apartment. The suspect was worried about the complainant calling the police and he kept saying, "I don't want to do 20, I don't want to do 20, don't take me away from my mom, I don't want to go to jail." The complainant stated the suspect began to get very remorseful and was talking about what was in the "pill." The complainant stated that the suspect possibly took a pill but she was unsure if he did and what it was. The suspect stated, this was not him and that he did not do things like this. The complainant stated she spent about an hour trying to get the suspect to leave and convince him that he would be okay. The complainant asked the suspect if he was going to kill her and he told the complainant he was not going to hurt her.
>
> The suspect then grabbed the complainant's phone got her to turn it back on because he had the complainant turn her phone off during the night. The suspect went on Facebook messenger and messaged back and forth from his phone to the complainant's phone, trying to make it look like they has everything planned and that the complainant had threatened the suspect via messenger to call the police and report a sexual assault if the suspect did not pay the complainant $60.00. The complainant stated it reads like messages back and forth but it was all the suspect.
>
> The suspect took two naked pictures of the complainant and told the complainant that if she called the police he was going to send the pictures to a friend who was going to post them somewhere. The complainant stated she tried to convince the suspect that she would not "flip" on him, the suspect's word "flip." The complainant told the suspect he could use the back stairs to leave the building and not be seen on camera. Eventually the suspect leaves the complainant's address. The complainant stated, once the suspect left she got dressed and rode her bicycle to Kaiser. Kaiser called MPD. The complainant stated that she was pretty sure the suspect ejaculated on the bed in the sheets or on the floor. The complainant was asked about any evidence in her apartment and she seemed reluctant to do so at this time. The complainant was asked about the knife, which she described as one of her knife set, a small black handled knife with a thin serrated blade. The complainant stated she looked for the knife but could not find it. The complainant was asked that if she did find the knife, we would really like to have it as part of evidence."

The victim identified her attacker as John, had known him about a year, and supplied his phone number and Facebook to police who were able to identify him as Conner**.** As a result, an MPDC detective presented a confirmation photograph of Conner to the victim at which time she positively identified him as the person who held her captive and sexually assaulted her.

She also stated that she thinks Conner ejaculated, possibly on the sheets or on the floor.

Also, during the victim's initial interview at the hospital, the victim described the knife as a small black-handled knife with a thin serrated blade. She also stated it is possible Conner took the knife with him when he left the scene.

Furthermore, surveillance video of the hallway leading to the victim's apartment door, shows Conner wearing orange in color pants, a black, white and orange baseball cap with a logo in the white portion of the cap, a white in color t-shirt with a logo on the left upper chest and a palm tree graphic on the back, and black and white sneakers. The surveillance video also shows Conner using what appears to be a cell phone.

The victim was transported to Washington Hospital Center for a SANE Exam. The following is a quoted narrative from the SANE Report:

> "Summary of patient history to injury and symptom(s) of assault:
>
> Patient report sexual assault by a former coworker. She reports that he came to her door at around 2 am today and identified himself. She reports that when she opened the door, he pushed himself in and threatened her with a knife. She reports that he punched her in the right side of her head and right forehead. She states "he forced himself into my mouth" clarified to mean his penis. "He injured my mouth, under my tongue." She reports repeated penile assaults to her mouth over 7 hours. "I could feel my mouth swelling and couldn't open my mouth the way he wanted me to." She reports tasting blood. She reports penile and digital penetration of the vagina once, and multiple penile and digital penetrations of her anus. She states she was moved "from the floor to the bed, always the same two things, anal, oral." "He would take a break and lay on top of me. My hands were tied, and he tucked a blanket around me so I couldn't move my arms, then he started again." She states "he choked my neck with two hands, and covered my nose and mouth, I was gasping for air. He tried to block my airways with his genitalia." She reports he put a gag in her mouth (sock or underwear), tied her wrists several times, with her arms bent, and also tied something, probably clothing, around her mouth and neck to hold the gag in her mouth. She reports he used string from her robe on her wrists.
>
> Patient reports she told him that apartment management was coming at 9 am and he left."

Another note in the "Background" portion of the SANE report is quoted as the following:

> "Patient reports sexual assault from 2 am to around 9 am this morning by a former coworker. She reports being punched in the head, gagged, strangulation without loss of consciousness, repeated penile to oral penetration with possible tongue injury. She reports digital and penile vaginal penetration x1, and repeated digital and penile anal penetration. She denies concern for DFSA [drug facilitated sexual assault]."

The SANE nurse also noted injuries to the complainant's body to include the following:

1. Tenderness to palpation on scalp above right ear;
2. Area of red discoloration with tenderness to palpation, central 1 cm abrasion;

3. Laceration under tongue, surrounded by swelling and red discoloration, patient reports pain when lifting her tongue;
4. Vertical linear abrasion to left anterior neck where patient reports assailant held a knife to her neck;
5. Area of mild red discoloration at base of neck on left;
6. Diffuse area of red discoloration left lateral upper back;
7. Linear abrasion to medical aspect of right wrist;
8. 0.5 cm brown/red discoloration across lateral aspect of left wrist wrapping around radial aspect in location where patient reports wrists were tied;
9. Area of red discoloration over left knee where patient reports being forced to kneel on rug;
10. Five lacerations on perineum ranging in size from approximately 4mm x 2mm to 2mm by less than 1mm.

The SANE report documented that in the prior five days, the victim had no consensual sexual activity with a male.

Also during the exam, the SANE nurse collected intimate swabs from the victim's body to include oral swabs, anorectal swabs, vaginal/cervical swabs, perianal/buttocks swabs and external genitalia swabs. These swabs were later sent to Bode Technology for DNA testing. As a result, on July 3, 2023, Bode Technology issued a DNA Case Report containing the following conclusions:

> **"MALE DNA SCREENING CONCLUSIONS:**
>
> The evidence was screened to identify samples containing sufficient male DNA expected to produce data for comparisons:
>
> 1. Male DNA was indicated in the following sample. This sample was processed further:
>
>    WDC2308-0142-E-04 [Perianal/Buttocks Swabs]
>
> 2. Male DNA was indicated in the following sample; however, due to the presence of high levels of total human DNA compared to male DNA, this sample was not processed for STR analysis:
>
>    WDC2308-0142-E-02 [Anorectal Swabs]
>
> **3.** Male DNA was not detected in the following samples. These samples were not processed further:
>
>    WDC2308-0142-E-01 [Oral Swabs]
>    WDC2308-0142-E-03 [Vaginal/Cervical Swabs]
>    WDC2308-0142-E-05 [External Genitalia Swabs]
>
> **STR PROCESSING, RESULTS, AND CONCLUSIONS:**

The evidence was processed for DNA typing using the Globalfiler kit.

1. A DNA profile was obtained from the sample WDC2308-0142-R-06 [the victim].

2. The partial DNA profile obtained from the sperm fraction (SF) of sample WDC2308-0142-E-04 is consistent with a mixture of two individuals including [the victim] and one male contributor. This mixture profile was interpreted assuming two contributors.

   [The victim] is assumed to be present in the mixture obtained from the sperm fraction (SF) of sample WDC2308-0142-E-04 and was subtracted from the mixture for interpretation purposes.

3. The DNA profile obtained from the epithelial fraction (EF) of sample WDC2308-0142-E-04 is consistent with a mixture of two individuals including [the victim] and alleles consistent with the male contributor."

On February 9, 2024, the DC DFS issued a CODIS Notification letter reflecting that the DNA profile obtained from the Perianal/Buttocks Swabs (Sperm Fraction) in Offense Three (CODIS Specimen ID WDC2308-0142/E-04-SF_C2) was entered into CODIS in accordance with local and national regulations. The Notification stated that the profile(s) will be maintained for routine searching in the DC state database (SDIS) and, if eligible, the national database (NDIS). The Notification further reflected Forensic case-to-case hits between that profile and the CODIS profile associated with Offense Two (CODIS Specimen ID M100001/1A.4SF, the Sperm Fraction of the Vaginal Swab, Profile associated with JOHN RAYMOND CONNER) and the CODIS profile associated with Offense One (CODIS Specimen ID 11_C3_DFS-20-03092, the Sperm Fraction of the Vaginal Swab).

## SORNA VIOLATION

On October 1, 2010, Conner pled guilty, pursuant to Alford v. North Carolina, 400 U.S. 25 (1970), to Third Degree Sexual Abuse and Kidnapping (2009 CF1 026457) – set forth as Offense Two in the Sexual Assault Offenses section above. Conner was sentenced on November 29, 2010, and was required to register as a sex offender after release.

On July 15, 2013, Conner completed his initial registration as a Sex Offender in the District of Columba, at which time he was classified as a Class B Registrant. As a Class B registrant, the DC Sex Offender Act of 1999 requires the defendant to register annually for ten years and to comply with any requirement adopted by the D.C. Court Services and Offender Supervision Agency ("CSOSA") pursuant to the requirements of SORA. CSOSA records document that on July 15, 2013, Conner completed a sex offender registration form indicating that he understood that he had a duty to report within three days of the following: (1) any changes of home, work, or school address; (2) any changes in motor vehicle information; and/or (3) any significant changes in

physical appearance. Furthermore, the sex offender verification form advised Conner of his responsibility to register annually and that the duty to register as a sex offender is unaffected by the termination of his probation, parole, or any other form of supervised release.

CSOSA Sex Offender Registry notes indicate that on October 27, 2022, Conner reported to the Sex Offender Registry. Conner "reported that he [was] residing at 1265 16th Street NE, Washington DC, 20002." Conner stated that his Facebook name is "Speedy Jay."

CSOSA Sex Offender Registry notes from December 7, 2022 state that on December 7, 2022, Conner had just been released from incarceration at Prince George's Correction Department and completed a SOR Verification Form in the District of Columbia. Conner "reported that he is residing at 1265 16th Street NE, Washington, D.C." Conner "had no questions or concerns." Conner acknowledged that his next registration date was October 27, 2023. CSOSA notified Conner that his current End Registration Date was February 20, 2026.

On October 19, 2023, a CSOSA Sex Offender Registration Specialist attempted to contact Conner by phone, but the number previously provided by Conner was disconnected. On October 27, 2023, Conner failed to report to the Sex Offender Registry as he had previously acknowledged.

On November 2, 2023, members of MPDC contacted Conner and arranged to meet him at 1265 16th Street NE, Washington, D.C to update his records. An MDPC detective met with Conner in a MPDC vehicle near 1265 16th Street NE, Washington, DC, and Conner advised that he resided there. The MPDC detective did not go into the residence located at 1265 16th Street NE, Washington, D.C. to confirm that Conner was living there.

On the following dates Conner signed a D.C. Sex Offender Verification Form certifying, among other things, that he is "aware of [his] responsibility to provide notice to the Court Services and Offender Supervision Agency within 3 days of changing [his] address or other registration information": July 5, 2013; July 23, 2014; August 4, 2015; February 3, 2017; February 27, 2017; March 14, 2017; March 20, 2017; October 4, 2017; October 12, 2018; November 14, 2018; December 6, 2018; May 28, 2019; October 10, 2019; October 27, 2022, December 7, 2022; and November 2, 2023.

On February 13, 2024, a current occupant of 1265 16th Street NE, Washington, D.C.—Witness Two ("W-2")—was interviewed by law enforcement officers. W-2 indicated that IT and W-2's family members had been living at that address for less than a month. W-2 did not know Conner and confirmed that Conner had not resided at that location since they moved in.

On February 13, 2024, Conner was arrested pursuant to a District of Columbia Superior Court Arrest Warrant in connection with Offense One and Three, described above.

On or about April 24, 2024, Witness Three ("W-3") a former occupant of 1265 16th Street NE, Washington, D.C. was interviewed by your affiant. W-3 confirmed that she leased the residence until June 2023. W-3 stated that Conner resided with her at that address for a time beginning at some point in 2020, but after an incident in September 2022 she forced Conner to move out of the residence. W-3 confirmed that after September 2022, Conner never resided at that address again.

W-3 confirmed that, after Conner moved out, when Conner received mail at 1265 16th Street NE, W-3 would bring it to the home of a family member of Conner.

Pursuant to 34 U.S.C. § 20911 and § 20913, Conner is a sex offender required to register and keep his registration current in each jurisdiction where he resides, is employed, or is a student. Conner is a Class B sex offender, required to register in the District of Columbia for a period of ten years, pursuant to 22 D.C. Code §§ 4001, 4002(a), and 4011(b)(2)(B). Conner is currently charged in District of Columbia Superior Case Number 2024 CF1 001461 with two counts of First Degree Sexual Abuse While Armed with Aggravating Circumstances, in violation of 22 D.C. Code §§ 3002(a)(1), 3020 (a)(5), 3020(a)(6), and 4502. That charge is a “crime of violence” pursuant to 18 U.S.C. §2250(d)(1) and 23 D.C. § 1331(4).

Conner failed to update the District of Columbia Sex Offender Registry to reflect a new address after moving out of 1265 16th Street NE, Washington, D.C. in September 2022, did not update his residence information with CSOSA by April 17, 2023, (the date of Offense Three), and falsely advised CSOSA SOR and MPDC that he was still residing there in November 2023. On or about April 17, 2023, while not in compliance with 18 U.S.C. § 2250(a), Conner committed the offense of First Degree Sexual Abuse While Armed with Aggravating Circumstances, a crime of violence under the law of the District of Columbia.

## CONCLUSION

As a result of the above facts and investigation, your Affiant believes that there is probable cause to believe that from September 2022 through the present, within the District of Columbia, **JOHN RAYMOND CONNER III** committed the offense of Failure to Register as a Sex Offender, in violation of 18 U.S.C. § 2250(a). There is also probable cause to believe that he violated 18 U.S.C. § 2250(d)(1), in that he committed a crime of violence under the law of the District of Columbia while not in compliance with 18 U.S.C. § 2250(a). Finally, there is probable cause that on or about both August 24, 2009 and on or about April 17, 2023, Conner committed First Degree Sexual Abuse while Armed With Aggravating Circumstances, in violation of 22 D.C. Code §§ 3002(a)(1), 3020 (a)(5), 3020(a)(6), and 4502.

Respectfully Submitted,

Alexander P. Mac Bean
Detective, D1-1320
Metropolitan Police Department – District of Columbia

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 21, 2024.

Digitally signed by G. Michael Harvey
Date: 2024.05.21 10:52:38 -04'00'

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE